**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CANOPIUS US INSURANCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:15-cv-3673-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| CHARLES MIDDLETON, JR. d/b/a | ) | |
| CHARLEY O'S, OMAR HAMILTON, | ) | |
| JAMAR HAMILTON, ANTWONIA | ) | |
| HEYWARD, BRANDON GREENE, | ) | |
| and LATEIKA JONES, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The following matters are before the court on plaintiff Canopius US

Insurance, Inc.'s ("Canopius") first and second motions for summary judgment, as

well as defendants Omar Hamilton, Jamar Hamilton, Antwonia Heyward (the

"Hamilton-Heyward defendants"), and Lateika Jones's ("Jones," together with the

Hamilton-Heyward defendants, the "moving defendants") competing motion for

summary judgment. For the following reasons, the court denies Canopius's first

motion for summary judgment, grants Canopius's second motion for summary

judgment, and grants in part and denies in part the moving defendants' motion for

summary judgment.

**I.  BACKGROUND**

In the early morning of February 22, 2015, the moving defendants and

defendant Brandon Greene ("Greene") were shot at Charley O's, a North Charleston,

South Carolina, nightclub owned by defendant Charles Middleton, Jr. ("Middleton").

Though it is unclear what exactly precipitated the shooting, the local media reported

that police investigators believe the shooting related to a longstanding feud between Stanley Greene[1] and defendant Omar Hamilton. Pl.'s First Mot. Exs. B, C (local news articles describing investigation of the incident). Two defendants—Jones and Greene—also suggested that the gunfire was related to some sort of feud in their correspondence with Canopius. See Pl.'s First Mot. Ex. H (letter from Jones's counsel stating that "a customer . . . began firing because of some feud"); Pl.'s First Mot. Ex. G (letter from Greene's counsel including draft complaint which alleges that "a dispute . . . escalated into gunfire"). However, this information has not been confirmed or presented in the form of admissible evidence. All that is known is multiple shots were fired and the incident caused a number of patrons to flee the premises. Pl.'s First Mot. Ex. J, Jones Interrogatories at 3.

At the time of the incident, Middleton held a commercial general liability insurance policy with Canopius (the "Policy"). Pl.'s First Mot. Ex. A, Policy. Under the Policy, Canopius agreed to "pay those sums that [Middleton] becomes legally obligated to pay as damages because of 'bodily injury'" when such "'bodily injury' is caused by an 'occurrence'" during the policy period. Id. at 22. "Bodily injury" is defined under the Policy as "bodily injury, sickness or disease sustained by a person." Id. at 33. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 35. The Policy provides a $1,000,000 per occurrence limit for this coverage. Id. at 17.

---

[1] The alleged shooter, Stanley Greene, is of no relation to defendant Brandon Greene.

The Policy also contains an Assault and Battery Exclusion ("A/B Exclusion"), which provides that coverage "does not apply to any claim and/or cause of action arising from"

> 1. An assault and/or battery regardless of culpability or intent; or
>
> 2. A physical altercation; or
>
> 3. Any act or failure to act to prevent or suppress such assault and/or battery or physical altercation.

Id. at 47. The A/B Exclusion further specifies that the Policy also excludes the follwoing:

> 4. Damages arising out of allegations of negligent hiring, placement, training or supervision, or to any act, error, or omission relating to such assault and/or battery or physical altercation[; and]
>
> 5. Damages arising out of failure to provide proper security or safe premises to any person subject to and assault and/or battery or physical altercation.

Id.

Canopius filed the instant declaratory judgment action on September 15, 2015, before any action was filed against Middleton, seeking a declaration that it has no obligation to indemnify the defendants for any bodily injury that resulted from the February 22, 2015 incident. Compl. ¶¶ 18–20. Canopius filed its initial motion for summary judgment in this action on February 24, 2016.

On March 4, 2016, Greene filed a civil lawsuit against Middleton in the Court of Common Pleas for Charleston County ("Greene Action"). Greene's complaint alleges that "a dispute occurred amongst [] patrons inside Charley O's," and that "this dispute escalated into gunfire resulting in four [] innocent patrons, including [Greene], being shot." Pl.'s Second Mot. Ex. A, Greene Compl. ¶¶ 4, 5. Greene

further claims his injuries were caused by Middleton's negligence in "failing to protect [Greene] from foreseeable risk of physical harm; [] failing to implement proper measures to deter and prevent crimes on [the] premises; [] failing to staff adequate personnel to ensure the rights and safety of [Greene]; [and] failing to train personnel as were on hand in the best security practices." Id. ¶ 10. Middleton has demanded that Canopius provide a defense in the Greene Action and indemnify him for any damages incurred in connection therewith. Pl.'s Second Mot. Ex. B.

On April 14, 2016, following the filing of the Greene Action, Canopius filed a second motion for summary judgment, specifically requesting a declaration that it had no duty to defend or indemnify any defendant with regard to that action. On May 2, 2016, the moving defendants filed a joint response to both motions as well as their own motion for summary judgment.[2] On May 5, 2016, Canopius filed a response to the moving defendants' motion, and on May 16, 2016, the moving defendants filed a reply. The court held a hearing on the motions on June 22, 2016.

On July 19, 2016, the Hamilton-Heyward defendants brought three separate, but identical, actions against Middleton in the Court of Common Pleas for Charleston County ("Hamilton-Heyward Actions"). See Exhibit A, Omar Hamilton Compl. ¶¶ 1–5; Exhibit B, Jamar Hamilton Compl. ¶¶ 1–5; Exhibit C, Antwonia Heyward Compl. ¶¶ 1–5. Unlike the Greene Action, the Hamilton-Heyward Actions do not specifically allege that the February 22, 2015 incident arose from a dispute. Instead, the Hamilton-Heyward defendants simply allege that they were "injured by the

---

[2] Middleton also filed responses and motions which simply incorporated the moving defendants' arguments.

discharge of a firearm at [Middleton's] premises," and that their injuries were the result of Middleton's negligence.  E.g., Omar Hamilton Compl. ¶ 3.

The motions are now ripe for the court's review.

## II.  STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Any reasonable inferences are to be drawn in favor of the nonmoving party.  See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012).  However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact.  See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.  See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191.  Rather, "a party opposing a properly supported motion for summary

judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (amended 2010)).  If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325.  The nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### III.  DISCUSSION

The instant motions revolve around a single question:  whether the A/B Exclusion applies to claims arising from the events of February 22, 2015.  Canopius argues that it does because the shooting necessarily constituted either an assault or battery under the Policy, and the defendants' injuries were all caused by the shooting.  Pl.'s First Mot. 10–14; Pl.'s Second Mot. 7–9.  In response, Middleton and the moving defendants argue that the shots were not necessarily fired in connection with an assault or battery, as those terms are defined in the Policy, and the A/B Exclusion

6

creates an internal ambiguity in the policy which must be construed in favor of the insured. Def.'s Joint Mot. 3–4. On the basis of these arguments, Canopius asks the court to grant summary judgment in its favor, relieving it of any duty to defend or indemnify Middleton in connection with the Greene Action, the Hamilton-Heyward Actions, and any future action that may be brought by Jones. The moving defendants ask the court to reach the opposite result—at least with respect to their claims[3]—and grant summary judgment in their favor.

"Pursuant to South Carolina law, an insurer's duty to defend is determined by the allegations of the underlying complaint." Union Ins. Co. v. Soleil Grp., Inc., 465 F. Supp. 2d 567, 572 (D.S.C. 2006). "If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend." Id. at 573 (quoting Isle of Palms Pest Control Co. v. Monticello Ins. Co., 459 S.E.2d 318, 319 (S.C. Ct. App. 1994)). The duty to indemnify, on the other hand, "is based on evidence found by the factfinder." Id. (quoting Ellett Bros. v. U.S. Fid. & Guar. Co., 275 F.3d 384, 388 (4th Cir. 2001)). If an insurer has no duty to defend, it necessarily has no duty to indemnify, but if it does have a duty to defend, the court may be unable to determine whether the insurer has a duty to indemnify until the resolution of the underlying action. See Am. S. Ins. Co. v. Moras Roofing, LLC, No. 2:09-cv-1966, 2010 WL 2710588, at *3 (D.S.C. July 7, 2010) (explaining that "[i]f [p]laintiff has no duty to defend . . . it will know it does not have a duty to

---

[3] It is not clear that the moving defendants intend their arguments to apply to the Greene Action, because that action was never addressed in the moving defendants' briefing. Greene, notably, is in default.

indemnify," but "[i]f [p]laintiff does have a duty to defend," the court should stay

litigation regard the duty to indemnify until completion of the underlying litigation).

Therefore, the court must address whether the structure and content of the A/B

Exclusion applies to the allegations set forth in the Greene Action, the Hamilton-

Heyward Action, and Jones's potential future claims.

### A.     Defining the Content and Scope of the A/B Exclusion

"An insurance policy is a contract between the insured and the insurance

company, and the terms of the policy are to be construed according to contract law."

Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008). "The cardinal

rule of contract interpretation is to ascertain and give legal effect to the parties'

intentions as determined by the contract language." Beaufort Cty. Sch. Dist. v.

United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v.

State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)). "If the contract's

language is clear and unambiguous, the language alone, understood in its plain,

ordinary, and popular sense, determines the contract's force and effect." Id. (citing

Schulmeyer, 579 S.E.2d at 134). "However, an insurance contract which is 'in any

respect ambiguous or capable of two meanings must be construed in favor of the

insured.'" Id. (quoting Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C.

1968)). "The rules of contract construction require exclusionary clauses to be

narrowly interpreted." Id. at 96 (citing Buddin v. Nationwide Mut. Ins. Co., 157

S.E.2d 633, 635 (S.C. 1967)).

As noted above, the A/B Exclusion extends to "any claim and/or cause of

action arising from:  an [a]ssault and/or [b]attery."  Policy at 47.  "[F]or the purpose

of construing an exclusionary clause in a general liability policy, 'arising out of' should be narrowly construed as 'caused by.'" McPherson, 426 S.E.2d at 771. To satisfy this "caused by" standard, the nexus between the cause and effect must be "immediate and direct." See S.C. Farm Bureau Mut. Ins. Co. v. Berlin, 2005 WL 7082978, at *3 (S.C. Ct. App. Jan. 25, 2005) (finding that damage to insured's home was "caused by" honeybees where "the nexus between the honeybees, honey, and damage [was] immediate and direct"). Here, it is clear that Greene, Jones, and the Hamilton-Heyward defendants' injuries were immediately and directly caused by the shooting. The question, then, is whether the shooting constituted an assault or battery under the A/B Exclusion.

The parties each attempt to define assault and battery by looking to South Carolina case law. Def.'s Joint Mot. and Resp. 4. South Carolina courts have set forth different definitions for the term "assault." In the criminal context, an assault is defined as "an unlawful attempt or offer to commit a violent injury upon the person of another, coupled with a present ability to complete the attempt or offer by a battery." In re McGee, 299 S.E.2d 334, 334 (S.C. 1983). In the civil context, "[t]he elements of assault are: (1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm." Mellen v. Lane, 659 S.E.2d 236, 244 (S.C. Ct. App. 2008). The bulk of South Carolina authority defines a "battery" as "the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree." Id. Alternatively, "[battery] is sometimes defined as any injury done to the person of another in a rude, insolent, or revengeful way." Id. (quoting Smith v. Smith, 9 S.E.2d 584, 589 (S.C. 1940)).

With these general definitions in mind, the court now turns to the application of the A/B Exclusion to the Greene Action, the Hamilton-Heyward Actions, and any potential action Jones might bring.

**B.    Greene Action**

The complaint in the Greene Action alleges that, on February 22, 2015, "a dispute occurred amongst [] patrons inside Charley O's," and "this dispute escalated into gunfire resulting in four [] innocent patrons, including [Greene], being shot." Greene Compl. ¶¶ 4, 5.  The complaint then alleges that Greene's injuries were proximately caused by Middleton's negligence, gross negligence, recklessness, and willfulness.  Id. at 10.  Canopius argues that these allegations are directly covered by the A/B Exclusion.  Def.'s Second Mot. 7–9.

The allegations in the Greene complaint quite clearly indicate that the gunfire arose from an assault or battery, no matter how those terms are defined.  Firing a gun in connection with a dispute is almost invariably done to threaten or intimidate the other parties to the dispute.  See In re McGee, 299 S.E.2d at 334 (defining assault to include "an unlawful . . . offer to commit a violent injury upon the person of another").  Such action certainly places others in "reasonable fear of bodily harm." Mellen, 659 S.E.2d at 244.  It makes no difference that the dispute did not involve Greene because the A/B Exclusion does not require that the subject claims be brought by the target of an assault, only that they "arise from" an assault.  See Coleman v. Acceptance Indem. Ins. Co., 369 F. App'x 595, 597 (5th Cir. 2010) (finding victim's involvement in an altercation "immaterial to the applicability of the [Assault and Battery] Exclusion[,]" which barred "coverage for 'any claims arising out of Assault

10

and Battery or out of any act or omission in connection with the prevention or suppressions of such acts").[4]  Greene's claims "arise from" the alleged assault because the assault immediately and directly brought about the injuries those claims seek to redress.

Therefore, the court grants Canopius's second motion for summary judgment with respect to the Greene Action.

### C.    Hamilton-Heyward Actions

The recently filed Hamilton-Heyward Actions do not specify the circumstances that led to the gunfire on the night of the incident.  Instead, they simply allege that the Hamilton-Heyward defendants were each "injured by the discharge of a firearm at [Middleton's] premises."[5]  E.g., Omar Hamilton Compl. ¶ 3.  This forces the court to ask whether any set of circumstances encompassed by these rather broad allegations would be covered under the Policy.  The moving defendants suggest that if the gun fired accidentally, the incident would fall within the definition of a covered "occurrence" under the Policy and would not be excluded by the A/B Exclusion.

---

[4] Alternatively, the court could apply the doctrine of transferred intent to hold that the shooter actually assaulted, or even battered, Greene and the other victims. See USF Ins. Co. v. D & J Enters., Inc., No. 0:09-cv-2510, 2010 WL 2232211, at *4 (D.S.C. June 3, 2010) (using the theory of "transferred intent" to find that the intent to assault the employees transferred to the victim and, thus, the assault and battery exclusion applied).  Either analysis leads to the conclusion that the A/B Exclusion applies.

[5] Indeed, beyond a handful of speculative media reports, police reports, and certain settlement demand letters—all of which are inadmissible as evidence in this case—the parties simply have been unable to demonstrate the circumstances of how and why the gun went off.  See Def.'s Joint Mot. and Resp. Ex. A, Olson Depo. 23:22–24 (Canopius's Rule 30(b)(6) witness, conceding that "we don't know" circumstances of the shooting).

Def.'s Joint Mot. and Resp. 5–7.  Canopius contends that the A/B Exclusion applies regardless of the "shooter's" intent.[6]

By its terms, the A/B Exclusion applies to claims arising from "[a]n assault and/or battery <u>regardless of culpability or intent</u>."  Policy 47 (emphasis added).  There is no question this language encompasses intentional assaults or batteries, such as the discharge of a firearm in an effort to intimidate or harm an adversary.  Canopius's duty to defend in the Hamilton-Heyward Actions, therefore, turns on whether the accidental discharge of a gun falls within the Policy's definition of an "unintentional" assault and/or battery.  <u>Id.</u>  The trouble with this task lies in defining an assault or battery without reference to the actor's mental state.

### 1.    Battery

With respect to battery, the intentless definition never gets off the ground.  As the <u>Mellen</u> court explained,

> Generally speaking, a <u>battery</u> is the unlawful touching or striking of another by the aggressor himself or by any substance put in motion by him, done with the intention of bringing about a harmful or offensive contact which is not legally consented to by the other, and not otherwise privileged.  It is sometimes defined as any injury done to the person of another in a rude, insolent, or revengeful way.

<u>Mellen</u>, 9 S.E.2d at 244 (quoting <u>Smith</u>, 9 S.E.2d at 589).  Canopius suggests that the <u>Mellen</u> court's second definition of battery—phrased in terms of "rude, insolent, or revengeful" behavior—contains no intent requirement, Pl.'s Reply 5, but this definition does not appear substantively different from the "general," intent-based definition.  The terms "rude, insolent, or revengeful" seem to mirror the terms

---

[6] The court recognizes that the term "shooter" is somewhat misleading when discussing the accidental discharge of a firearm.  Nevertheless, the court will adopt this term to mean the person whose actions allowed the firearm to discharge—however that may have occurred.

"harmful or offensive" in the first definition.  Id.  Moreover, notions of "rude[ness], insolen[ce], and revenge" are normative concepts that are largely tied to an actor's mental state.  Thus, there is little reason to think that this alternative formulation of the definition of battery actually removes intent from the equation, despite the fact that it does not mention intent specifically.[7]

Canopius also highlights the Mellen court's discussion of the "well recognized distinction between criminal assault and a civil action for an assault and battery," and its statement that "[i]n civil actions, [] intent, while pertinent and relevant, is not an essential element."  Id. at 245 (quoting Herring v. Lawrence Warehouse Co., 72 S.E.2d 453, 458 (S.C. 1952)).  On its face, this language appears to suggest that a civil action for battery does not require a showing of intent, but this proposition does not withstand closer scrutiny.  The reference to "an assault and battery" seems to regard the offenses as inseparably linked, rather than two potentially distinct claims for either "assault" or "battery," indicating the court's discussion does not apply to battery when considered as an independent tort.  See id. (emphasis added).  The court then goes on to explain that "[t]he rule, supported by the weight of authority, is that the defendant's intention does not enter into the case, for, if reasonable fear of bodily harm has been caused by the conduct of the defendant, this is an assault."  Id. (quoting Herring, 72 S.E.2d at 458).  This explanation has nothing to do with battery

---

[7] At least one court in this district appears to have reached the same conclusion, recognizing that Mellen does not remove all intent from the definition of battery, only the specific intent to cause bodily injury.  See Auto Owners Ins. Co. v. Pers. Touch Med Spa, LLC, 763 F. Supp. 2d 769, 780–81 (D.S.C. 2011) ("In the case of a battery, a person arguably could be found liable for touching someone with the intent of bringing about an offensive contact as opposed to bodily injury." (citing Mellen, 659 S.E.2d at 244)) on reconsideration in part, 2011 WL 4962917 (D.S.C. Oct. 18, 2011).

and further suggests that the preceding reference to "an assault and battery" did not apply to "battery" when considered in isolation.

At most, the <u>Mellen</u> court's discussion of this "well recognized distinction" provides some thin support for the proposition that a battery can be "unintentional" when it occurs in connection with an assault. However, this observation simply moves the focus of the inquiry from battery to assault, and does not answer the question of whether the moving defendants' claims are subject to the A/B Exclusion. Even assuming one can commit unintentional battery in connection with an assault, there would never be any reason to invoke this variation of battery under the A/B Exclusion because the predicate assault would already bring the incident within the scope of that provision. For the term "battery" to have any operative meaning under the Policy, it must be susceptible of some definition that does not require an underlying assault. The only recognized definitions of battery that satisfy this condition contain some element of intent.

Because the Policy's attempt to remove "culpability or intent" from the definition of battery simply renders the term meaningless, the court finds that the Hamilton-Heyward Actions do not necessarily arise from a "battery," as defined by the A/B Exclusion.

### 2.    Assault

Canopius's attempt to demonstrate that the incident fell within the Policy's definition of "assault" fares somewhat better. As noted above, there is some support in South Carolina case law for the proposition that one may commit a civil assault unintentionally. This occurs when one's conduct causes another "reasonable fear of

bodily harm."  Id. (quoting Herring, 72 S.E.2d at 458).  This "reasonable fear" requirement does not require that the victim be subjectively "frightened" in the colloquial sense.  It simply requires that "[t]he conduct [] be of such nature and made under such circumstances as to affect the mind of a person of ordinary reason and firmness, so as to influence his conduct."  Id. at 244.  There is at least some evidence in the current record suggesting that the incident influenced the bar patrons' conduct by prompting them to rush outside to avoid the gunfire.  See Pl.'s Mot. Ex. J, Jones Interrog. at 3 (stating that Jones heard guns shots, fell to the ground, people were running over her, and she was able to get up and run toward the exit with the crowd).  Thus, it would seem there is evidence an assault was committed against someone, and the Hamilton-Heyward defendants' injuries were caused by that assault, bringing their claims within the scope of the A/B Exclusion.

The problem with this analysis is that removing intent from the definition of assault creates an exclusion that swallows up the coverage the Policy purports to provide for claims arising from "bodily injuries."  South Carolina courts refuse to give effect to policy exclusions that would render the coverage provisions "virtually meaningless."  Isle of Palms, 459 S.E.2d at 321.  The Isle of Palms court relied on this principle in refusing to adopt the insurer's interpretation of a "professional services" policy exclusion in a pest control company's commercial liability policy that effectively "exclude[d] coverage for all claims arising from [the insured's] exterminating services, the very risk contemplated by the parties."  Id.

While the Isle of Palms court characterized its holding in terms of "ambiguity," the same principle can be seen in the Supreme Court of South

Carolina's decision in <u>Bell v. Progressive Direct Insurance Co.</u>, in which the court

addressed the "reasonable expectations" doctrine.  As the <u>Bell</u> court explained,

> the [c]ourt will look to the reasonable expectations of the insured at the
> time when he entered into the contract if the terms thereof are
> ambiguous or conflicting, or if the policy contains a hidden trap or
> pitfall, or if the fine print takes away that which has been given by the
> large print.

757 S.E.2d 399, 407 (S.C. 2014) (quoting <u>Hallowell v. State Farm Mut. Auto. Ins.

Co.</u>, 443 A.2d 925, 927 (Del. 1982)), <u>reh'g denied</u> (May 7, 2014).

Though the <u>Bell</u> court cautioned that the reasonable expectations doctrine only

applies when the language of the contract is somehow unclear, <u>id.</u> at 406–07, it

indicated this condition may be satisfied in a number of ways—meaning the

reasonable expectations doctrine may apply in situations in which the policy's terms

are, at least technically, unambiguous.[8]  <u>See id.</u> at 407 (recognizing reasonable

expectations doctrine applies when a policy's terms "are ambiguous or conflicting, <u>or</u>

if the policy contains a hidden trap or pitfall, <u>or</u> if the fine print takes away that which

has been given by the large print" (emphasis added) (quoting <u>Hallowell</u>, 443 A.2d at

927)).  This reading is bolstered by the <u>Bell</u> court's citation to language in <u>South

Carolina Farm Bureau Mutual Insurance Co. v. Kennedy</u>, in which the court held that

"the literal interpretation of policy language will be rejected where its application

would lead to unreasonable results and the definitions as written would be so narrow

---

[8] For this reason, the court hesitates to equate the conditions required to apply
the reasonable expectations doctrine under <u>Bell</u> with the concept of ambiguity
addressed in <u>Isle of Palms</u>.  In <u>Isle of Palms</u>, the ambiguity came from the fact that
the two provisions were in such complete conflict that it was unclear how they could
ever be applied together.  459 S.E.2d at 320–21.  However, for the reasons described
above, the reasonable expectations doctrine does not seem to require this level of
conflict to apply.  Undoubtedly, though, the doctrines are quite similar, and if one
applies <u>Isle of Palms</u> using a somewhat liberal definition of "ambiguity," they
become almost indistinguishable.

as to make coverage merely 'illusory.'" 730 S.E.2d 862, 867 (S.C. 2012) (quoting

Empire Fire & Marine Ins. Cos. v. Citizens Ins. Co., 43 A.3d 56, 60 (R.I. 2012)).

Thus, the simple fact that policy terms <u>can</u> be read together in a straightforward

manner does not preclude the application of the reasonable expectations doctrine

when this reading produces an absurd result.  See Clark-Peterson Co. v. Indep. Ins.

Assocs., Ltd., 492 N.W.2d 675, 677 (Iowa 1992) ("The [reasonable expectations]

doctrine is carefully circumscribed; it can only be invoked where an exclusion '(1) is

bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the

dominant purpose of the transaction.'" (quoting Aid (Mut.) Ins. v. Steffen, 423

N.W.2d 189, 192 (Iowa 1988))); <u>see also</u> Bell, 757 S.E.2d at 407 (citing Clark-

Peterson with approval for proposition that reasonable expectations doctrine applies

under specific conditions).

     The difference between a policy that "unambiguously denies coverage under

its plain terms," Bell, 757 S.E.2d at 406, and a case where "the literal interpretation of

policy language . . . would lead to unreasonable results," Kennedy, 730 S.E.2d at 867,

is necessarily one of degree, not kind.  Every policy exclusion "conflicts" with the

grant of coverage in some sense because it carves out categories of events, claims,

etc. that would otherwise be covered.  But this alone is not enough.  The court must

look to the nature and extent of the "conflict" to determine whether it produces any of

the ill effects addressed by the reasonable expectations doctrine or the sort of

ambiguity addressed in Isle of Palms.

     In this case, the court finds that the literal interpretation of the A/B Exclusion

does produce such an outcome.  If the court were to accept the A/B Exclusion's

17

language removing intent from the exclusion's definition of assault, then the A/B
Exclusion would apply to all claims arising from any conduct that causes "reasonable
fear of bodily harm."  Mellen, 9 S.E.2d at 244 (quoting Herring, 72 S.E.2d at 458).
This would necessarily include any accident involving bodily injury in which the
victim realized his danger.  The hypotheticals are endless—a dropped firearm, a
dropped tray, improperly installed equipment falling on a crowded dance floor, etc.
Each of these examples could be causally traced to some person's conduct, and so
long as at least one potential victim realized the danger, would induce a reasonable
fear of bodily injury.[9]  Canopius contends that the dropped tray scenario is
distinguishable because it represents an "'occurrence' for which the [A/B Exclusion]
does not apply," but fails to explain the reasoning behind this conclusion.  Def.'s
Reply 5; see also Olson Depo. 18:13–20:9 (recognizing that unintentionally dropped
tray scenario would be covered occurrence under the Policy).  Accepting, as the court
must, the allegations in the Hamilton-Heyward Actions, it is at least possible that the
gunfire that injured the Hamilton-Heyward defendants was just as accidental as the
hypothetical dropped tray.  Why, then, is one an "assault" and the other a covered
"occurrence"?  Both are certainly capable of inducing reasonable fear of bodily harm.
When pressed on this issue, Canopius's Rule 30(b)(6) representative could not offer

---

[9] This problem is even more pronounced when attempting to apply the
concept of battery without intent, because this would presumably include any conduct
causing physical injury at all.  Thus, even if the court were to recognize some legal
definition of battery that did not require intent, using such a definition in the A/B
Exclusion would only add to the conflict between the Policy's coverage provision and
the A/B Exclusion.

18

an explanation,[10] Olso Depo. 23:25–24:7, and the court has been unable to grasp this distinction on its own.

Thus, for the court to apply the A/B Exclusion to the Hamilton-Heyward defendants' claims, the court must also read that exclusion to apply to all claims arising out of any event that causes reasonable fear of bodily harm, even if that event was entirely accidental. This guts the Policy's initial grant of coverage regarding claims based on bodily injuries. Without the A/B Exclusion, the Policy would cover any "bodily injury" claims, so long as the "bodily injuries" were caused by an "occurrence"—an accident. Policy 22, 35. However, when Canopius's reading of the A/B Exclusion is applied,[11] the Policy only covers claims seeking damages for bodily injuries caused by events that did not produce any reasonable fear of bodily injury. Effectively, the A/B Exclusion purports to remove coverage for claims arising from any bodily injury that could be expected from the point of view of the victim. Concededly, this would leave some coverage for bodily injury caused by nonobvious

---

[10] Instead, Olson simply responded that the shooting was not accidental. Olson Depo. 24:5–24:7 ("I can't imagine how an accidentally [sic] shooting could have occurred that would have injured five people.") As noted above, the record contains no evidence to support this assertion, and in any event, Canopius's duty to defend and duty to indemnify the Hamilton-Heyward defendants is determined by the allegations, and subsequent findings, in the Hamilton-Heyward Actions.

[11] The court refers to Canopius's reading of the A/B Exclusion, rather than the A/B Exclusion itself, because the court is not entirely convinced that the A/B Exclusion cannot be read differently. For instance, it might be possible to read the A/B Exclusion to apply to claims arising from an assault or battery regardless of Middleton's culpability or intent, not the actor's culpability or intent. The court recognizes there are some problems with this reading, but it would seem to lead to a much more natural result than the reading proposed by Canopius. Nevertheless, because the parties have not explored this argument in any depth, and because it is not essential to the resolution of the instant motions, the court declines to rest its holding on this rationale.

conditions—perhaps mold or bacteria[12]—but it would greatly reduce the coverage available for claims arising out of "bodily injuries."  Moreover, it would do so in a rather bizarre way, by using an unobvious exclusion to change the essential character of the coverage.  The actual coverage Middleton would wind up with would be exceedingly narrow when compared to the Policy's coverage language.  The court finds this to be an unreasonable result, rendering the "bodily injury" portion of the Policy's coverage "illusory."  Consequently, Canopius's reading of the A/B Exclusion—which defines assault without reference to intent—must be rejected.

So long as an assault requires some form of intent, or mental state, the bare fact that a gun discharged does not bring the incident within the scope of the A/B Exclusion.  Because the Hamilton-Heyward defendants' allegations against Middleton preserve the possibility that the incident was purely accidental, the court finds that Canopius has a duty to defend Middleton in that action.  See Isle of Palms, 459 S.E.2d at 319 ("If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend.").  Of course, Canopius's duty to indemnify depends on the findings of fact in that action.  Thus, it is simply too early to make any determination of Canopius's obligations in that regard.

### D.     Jones's Potential Claims

Unlike Greene and the Hamilton-Heyward defendants, Jones has yet to file any action against Middleton.  Because "an insurer's duty to defend is determined by

---

[12] This is not to say that other exclusions would not apply to these examples, simply that they would escape the effect of the A/B Exclusion.  Although, if other exclusions apply, that only supports the argument that the literal meaning of the A/B Exclusion renders the Policy's "bodily injury" coverage illusory.

the allegations of the underlying complaint," <u>Soleil Grp.</u>, 465 F. Supp. 2d at 572, and "[t]he duty to indemnify . . . 'is based on evidence found by the factfinder,'" <u>id.</u> at 573 (quoting <u>Ellett Bros.</u>, 275 F.3d at 388), the court cannot say with certainty whether Jones's potential claims will be covered by the A/B Exclusion—or any other exclusion, for that matter.  It is entirely possible that Jones will file a complaint tracking the allegations in the Hamilton-Heyward Actions.  The court, however, simply does not have enough information available at this time to rule in either party's favor with respect to Jones's potential claims.

### IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** Canopius's first motion for summary judgment—except to the extent it overlaps with Canopius's second motion for summary judgment, **GRANTS** Canopius's second motion for summary judgment, and **GRANTS** the moving defendants' motion for summary judgment to the extent it relates to Canopius's duty to defend Middleton in the Hamilton-Heyward Actions, and **DENIES** the moving defendants' motion for summary judgment in all other respects.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 17, 2016**
**Charleston, South Carolina**